UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MICHELLE BELKOT, et al.,

　　　　　　　　Plaintiffs,

　　v.

CLARK COUNTY, et al.,

　　　　　　　　Defendants.

Case No. 3:25-cv-05326

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

## I.　INTRODUCTION

Plaintiff Michelle Belkot is an elected member of the Clark County Council ("the Council") who was appointed by the Council to serve as its representative on the Board of Directors of the Clark County Public Transportation Benefit Area ("C-TRAN"). When Belkot refused to follow the Council's directive for a C-TRAN vote, Belkot's colleagues on the Council removed her from the C-TRAN Board and replaced her with Council member and Defendant Wil Fuentes. Belkot alleges that her removal violated the First and Fourteenth Amendment, the Clark County Charter, and Washington's Open Public Meetings Act ("OPMA"). Plaintiff Kathryn Bauer, a Clark County resident who attends the Council's meetings, joins Belkot's suit.

Plaintiffs moved for summary judgment, asking the Court to decide all claims in their favor and reinstate Belkot to her position on the C-TRAN Board. Dkt. 23. Defendants responded

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 1

and filed their own motion for summary judgment, asking the Court to dismiss all claims. Dkt. 30.

Plaintiffs' claims fail as a matter of law. Finding oral argument unnecessary, the Court DENIES their motion for summary judgment (Dkt. 23) and GRANTS Defendants' motion for summary judgment. Plaintiffs' claims are DISMISSED WITH PREJUDICE.

## II.    BACKGROUND

The following facts are either not genuinely disputed in the summary judgment record or are taken in the light most favorable to Plaintiffs.

### A.    Facts

#### 1.    The Council and the C-TRAN Board

The Council is Clark County's legislative body, with five Councilors chosen for four-year terms via nonpartisan elections from separate districts within Clark County. Dkt. 24 ¶ 4; Dkt. 32 at 15, 24, 38. Belkot and Fuentes are both members of the Council. Dkt. 24 ¶¶ 5, 18.

C-TRAN is a public transportation benefit area[1] that provides transit services in Clark County. *Id*. ¶ 7. The C-TRAN Board consists of nine voting members who must be "elected officials serving at the pleasure of the governing bodies of the component cities and towns within the area and the County Commissioners in the area." Dkt. 32 at 4. Of the nine voting members, two—including Belkot's former seat—represent the Council as the governing body of Clark County. *Id*. Of the seven remaining members, three represent the City of Vancouver, one represents the City of Camas, one represents the City of Washougal, one represents the City of Battle Ground, and one represents the cities of Ridgefield and La Center, and the Town of Yacolt. *Id*. at 4–5.

---

[1] Established pursuant to RCW 36.57A, a public transportation benefit area is a type of municipal corporation which operates public transportation services. RCW 36.57A.010(7).

Belkot began her term as a council member in January 2023 after she was elected to represent District 2, which "consists entirely of unincorporated portions of Clark County, and no incorporated cities." Dkt. 24 ¶ 5; Dkt. 21 ¶ 21. Belkot was then "chosen among the members of the [Council] to be a member of the C-TRAN Board for a one-year term." Dkt. 24 ¶¶ 5–6. Belkot was chosen to serve on the C-TRAN board again in January 2025. Dkt. 31 ¶ 2.[2] Sue Marshall, a council member from District 5 and the Chair of the Council, occupied the Council's other seat on the C-TRAN board. *Id*. ¶ 1.

2.    *The Interstate Bridge Replacement ("IBR") Program*

The IBR Program "is a joint effort between Oregon and Washington to replace the aging Interstate Bridge across the Columbia River and make related interchange improvements within the five-mile corridor." *Interstate Bridge Replacement Program, Fact Sheet: A Bridge to the Future*, at 1 (June 2025), https://www.interstatebridge.org/media/pvgi1vod/2025_general_factsheet_062525_remediated.pdf. Among other things, the project seeks to "[e]xtend light rail from Portland Expo center to Vancouver's Evergreen Boulevard and add three new transit stations to improve access, link regional transit systems, and create new public transit options." *Id*.

The C-TRAN Board's actions regarding the IBR relevant to this litigation began in November 2024, when it "approved a language change that allowed C-TRAN to participate in funding the operations and maintenance of" light rail transit systems on the Interstate Bridge. Dkt. 31 ¶ 3; Dkt. 26 at 10. At the Council's regular weekly meeting (known as "Council Time") on January 8, 2025, Belkot "proposed the Council hold a work session on C-TRAN's November

---

[2] It is unclear whether Belkot was appointed for another one-year term between the term beginning "shortly []after" she became a council member in 2023 and the term beginning in January 2025—such that the latter was her *third* term on the C-TRAN Board—or whether she was only ever appointed twice.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 3

2024 decision so the entire Council could be informed on the issue." Dkt. 31 ¶ 4. A majority of the Council approved Belkot's motion and planned "a work session on C-TRAN's November 2024 decision with representatives from C-TRAN and TriMet." *Id*.

At a January 14, 2025 C-TRAN Board meeting, Belkot moved the C-TRAN board "to reconsider its November 2024 decision regarding light rail funding." *Id*. ¶ 5. Marshall "asked for time to confer with the Council to determine the Council's position on the issue," and the motion to reconsider was postponed until March 11, 2025. *Id*.

The Council discussed light rail funding through January and February, holding two work sessions that included presentations from IBR staff. *Id*. ¶¶ 6–9. Marshall and Belkot agreed that the purpose of these sessions was to "learn about the issues ahead of C-TRAN's vote on [Belkot's] motion in March." *Id*. ¶ 6. They outlined their plan at the January 15, 2025 Council Time meeting:

> Marshall: Councilor Belkot and I, on [the] C-TRAN Board, we can only vote in agreement with what this Council's position has been on any policy decision. So I think it's very important to get those briefings, have our questions answered, and maybe formulate a position related to, well and I think it would be whether or not C-TRAN expends any funding for light rail. That's what I think the issue, the policy issue, would be before us. But we could get that information but then it would equip both of us to be able to vote in accordance with what this Council would like.
>
> Belkot: Yes, and just one thing that I should add also, they are discussing about putting the cost of the [operations and maintenance ("ONM")] expenses for TriMet light rail on the ballot for Clark County taxpayers. So, we need to understand as a County Council how this is going to impact our taxpayers, and we are taxpayers as well.

*Id*. ¶ 6. Marshall reiterated that the Council needed "to be briefed in a timely way" so she and Belkot would "know how to vote on March 11th." *Id*. During the second work session on the morning of February 26, 2025, Marshall stated that "[t]he Council will have an opportunity to weigh in a policy direction, really largely for the benefit of Councilor Belkot and myself and the positions we may be taking [at] the March meeting at C-TRAN." *Id*. ¶ 8. Marshall previewed

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 4

that, during Council Time later that same day, the Council would "have an opportunity to talk about that vote that will be coming up in C-TRAN." *Id.*

       3.       *Council Time on February 26, 2025*

At Council Time on February 26, 2025, the Council "discussed at length" its position on C-TRAN's November 2024 decision to potentially fund the light rail extension. *Id.* ¶ 11. The agenda for Council Time on February 26 did not expressly note that the Council would be discussing light rail funding or any C-TRAN decision. Dkt. 26 at 4. Instead, the Council discussed and voted on the issue during the "policy updates" agenda item. Dkt. 31 ¶¶ 9–10.

When introducing the topic, Marshall stated, "[t]he question really that Councilor Belkot and I need for the Council to advise us on is the language change that is coming up for reconsideration." *Id.* ¶ 11. She also stated that "[it] is a requirement that those Councilors that serve on the C-TRAN Board follow the direction of this County Council." *Id.* "During the two work sessions and the February 26 Council Time meeting, Councilor Belkot never disputed that the purpose of the Council's work on the C-TRAN issue was to determine the Council's collective position" and to direct Belkot and Marshall how to vote on the C-TRAN Board's reconsideration of its November 2024 decision. *Id.* ¶ 14.

The Council ultimately voted 4-1 to maintain C-TRAN's November 2024 decision. *Id.* ¶ 12; Dkt. 24 ¶ 11. Belkot was the lone dissenting vote. *Id.* ¶ 11; Dkt. 31 ¶ 12.

       4.       *Council Time on March 12, 2025*

Belkot and Marshall attended the C-TRAN Board meeting on March 11, 2025, and Belkot moved to reopen her motion to reconsider C-TRAN's November 2024 decision. *Id.* ¶ 15; Dkt. 24 ¶¶ 12–14. When asked how she would vote, Belkot stated that she "planned on voting against it, along with all the representatives of the small cities, that is, all cities except the City of

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 5

Vancouver." *Id*. ¶ 13; Dkt. 31 ¶ 15. Marshall then "moved to table the pending motion, which was seconded and passed." Dkt. 24 ¶ 14.

The Council met the next day, at Council Time on March 12, 2025. *Id*. ¶ 15. Marshall brought up Belkot's statements during the "Councilor Reports" agenda item, "the standard agenda item during which councilors typically update the Council on relevant items from their respective board and committee assignments." Dkt. 31 ¶ 16.

> Marshall: Any other reports? I actually have a report I wanted to report back on the C-TRAN meeting. I know we spent—the Council spent a lot of time deliberating on the vote that was coming up before C-TRAN. And I guess to [] put this succinctly as possible: the motion whether or not to have permissive language for C-TRAN related to ONM for light rail, which was adopted by the C-TRAN Board in November and came back to the C-TRAN board this—well, last night for reconsideration.
>
> So Councilor Belkot moved to go back to the original language, which would not be permissive. And in the end it was—the motion was tabled.
>
> And so it will come back again in the April meeting, but I just want to clarify for the council, because it was my, you know, understanding that we had made a pretty clear recommendation on how—on advising the two councilors, Councilor Belkot and myself, on how to—how to vote. And that would've been to support the language that was adopted in November.
>
> So I bring this back to the council, I feel obligated to do that because I don't feel like the direction that was given by the council was actually followed by both of us. And we have another to go back. And so I'm [] just looking to the Council to advise me on how to move forward with this.
>
> Belkot: Chair?
>
> Marshall: Yes.
>
> Belkot: I've been on [] C-TRAN for almost two years, and I have voted differently than Chair Medvigy on several different things than C-TRAN. We don't have anything in our bylaws or the C-TRAN bylaws that preclude us from not having our own individual vote and not representing our constituents in our districts; that's never been an issue. There's been a history of councilors that have been on the C-TRAN Board that have voted differently. I've always had my own individual vote. And I think it's pretty dangerous if you are not able to represent your constituents in your districts. As you've mentioned before, our districts are all very different. My particular district is not interested in footing the bill of an Oregon transportation

system that's having extreme financial difficulties. And I'd like to mention as well, the [IBR] program, the bridge was moving along without us footing the tab of the ONM expenses of Tri-Met. This was never anything about jeopardizing the bridge, which I think we all collectively support and want this bridge. But this light rail issue is politicizing the IBR, and county residents have voted in '95, 2012, 2013 to oppose light rail. They want the bridge without the light rail . . . I am a county councilor for District 2, and I represent my constituents. Thank you.

Dkt. 26 at 10–12. After this exchange, another council member asked the County attorney whether the Council had language in their bylaws "that councilors on committees should follow the—the vote of the Council when they represent that same issue on their committee?" *Id*. at 13. The County attorney replied, "[n]o. That language is not in your rules of procedure." *Id*.

Councilor Glen Young then raised the possibility of removing Belkot from her position on the C-TRAN Board:

> [T]he two seats on [the] C-TRAN Board, they don't belong to a council district, they belong to the [Council] as a whole. And so when the Board of County Council is aware of an issue, decides to discuss it, and take an official position, at that point, that is what we have assigned the representatives on that board to represent our council to do.
>
> I don't think it needs to be in our bylaws . . . it's concerning to me that we have a councilor that is on a board that has chosen to vote in opposition of the Council as a whole. And I don't care about this issue. To me, it's not about light rail or not light rail. This is how we—in our assigned boards and committees, this is how we conduct business.
>
> And I—I think that it's very clear when the Council as a whole gives a direction, that that needs to be followed. You know, I have displayed this on many occasions where there's been a resolution or letter or something that the Council has agreed to, I was a no vote on it, but I still put my name on that letter because the Council as a whole has made that decision.
>
> So quite frankly, in my opinion, if we have a councilor that is not willing to reflect the will of the Council as a whole, they need to be relieved of that position and somebody else placed in it that will represent the Council as a whole. Because this will go a lot further than just light rail in the future. I think this is an important piece of the process that we need to dial in right now.

*Id*. at 18–19. Fuentes voiced his agreement, then moved to remove Belkot from the C-TRAN Board "as a result of not adhering to the [Council's] direction on the vote of four-to-one to keep

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 7

the existing MLPA language related to the ONM in light rail." *Id*. at 21–22. The motion to remove Belkot passed 4-1, with Belkot as the lone dissenting vote. *Id*. at 22. The Council then voted 4-1 for Fuentes—who had been an alternate on the C-TRAN Board in case one of the two Council members was unavailable—to take Belkot's seat. *Id*. at 25.

     5.     *Police Report from August 5, 2025*

In April 2025, non-party Rob Anderson filed a criminal complaint regarding the events above and requested an investigation by a "neighboring law enforcement agency." Dkt. 35-2 at 4. On April 19, 2025, Detective Christian Lyle was assigned by the Skamania County Sheriff's Office to investigate Anderson's complaint. *Id*. at 4–5. Lyle reviewed Anderson's complaint, agendas and videos from relevant Council Time meetings, and a video uploaded by Anderson[3] which appears to show Vancouver City Councilmember Erik Paulsen stating that the Council "set the trap for Councilor Belkot to spill her guts" on how she intended to vote. *Id*. at 4–6. Lyle also interviewed Anderson and Belkot but was unable to schedule an interview with the other Council members. *Id*. at 8–13.

Lyle concluded that there were "[n]umerous violations" to the Council's bylaws and the OPMA and that "Fuentes should be removed from the C-TRAN Board immediately and Council Member Belkot should be reinstated to her position on the C-TRAN Board." *Id*. at 13. Specifically, Lyle believed that (1) four Council members violated the OPMA because they

---

[3] Reform Clark County – Rob Anderson, LISTEN: Mayor Anne and Erik Paulsen Brag About Setting "The Trap" for Belkot To Force Light Rail (YouTube, Apr. 2, 2025), https://www.youtube.com/watch?v=r5rrTYIfszU. Anderson leads an organization called Reform Clark County, which aims to "serve as a catalyst for restoring constitutional republic principles in Clark County" and supports Councilor Belkot's campaign for reelection in 2026. Reform Clark County, https://www.reformclarkcounty.com (last visited March 9, 2025). Anderson also filed an action in Clark County against the Council and the individual members who removed Belkot from the C-TRAN Board, and the parties stipulated to a dismissal of that case in October 2025. Dkt. 37 at 4.

voted to remove Belkot and appoint Fuentes without public comment; (2) those members violated the Council's bylaws because they had no authority to replace Belkot with Fuentes absent his appointment by the Clark County Manager, Kathleen Otto; and (3) Otto may have violated RCW 9A.80.010 (Official Misconduct) because she failed to correct the Council's error. *Id*. at 6–7. He recommended that all members of the Council who voted to remove Belkot "should be fined for violation of the OPMA" and that County Manager Kathleen Otto could be charged under RCW 9A.80.010. *Id*. at 13.

Defendants asked the Court to exclude Lyle's report and not consider it in ruling on the present motion because it is inadmissible hearsay and is unreliable, incomplete, and untrustworthy. Dkt. 36. The Court ruled that it would consider the document as part of the summary judgment record along with "the parties' evidentiary arguments about the admissibility and significance of the exhibit." Dkt. 39.

**B.    Procedural History**

Belkot originally filed this action in the Superior Court of Washington for Skamania County on March 28, 2025. Dkt. 1-1. Defendants removed the case to this Court on April 17, 2025. Dkt. 1. Belkot amended her complaint on May 15, 2025, then again on August 8, 2025, adding Bauer as a plaintiff. Dkts. 15, 21. Defendants filed their answer on August 21, 2025. Dkt. 22.

Plaintiffs filed the present motion for summary judgment on August 29, 2025. Dkt. 23. Defendants submitted a response—along with their own cross-motion for summary judgment—on September 26, 2025. Dkt. 30. Plaintiffs responded on October 17, 2025, and Defendants replied on October 24, 2025. Dkts. 33, 34.

The Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and state claims under 28 U.S.C. § 1367.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 9

### III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1122 (9th Cir. 2024) (quoting *Anderson*, 477 U.S. at 256). Where, as with Plaintiffs' motion, the party moving for summary judgment "will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)).

The evidence relied upon by either party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 10

knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

### IV.    DISCUSSION

Plaintiffs assert five claims: (1) a First Amendment claim against Clark County for Belkot's removal from the C-TRAN Board; (2) a Fourteenth Amendment Equal Protection claim alleging Clark County violated the "one person, one vote" principle by removing Belkot from the C-TRAN Board and replacing her with Fuentes, who does not represent the unincorporated areas of Clark County; (3) a claim that Clark County violated its own Charter, alleging that the Council "does not have the power to remove one from a lawful appointment" before their term has run; (4) an OPMA claim alleging the Council failed to publish a detailed agenda and allow for public comment on both the C-TRAN reconsideration vote and the vote to remove Belkot from the C-TRAN board; and (5) a "Quo Warranto" claim under RCW 7.56 alleging that Fuentes usurped Belkot's former seat on the C-TRAN Board. Dkt. 21 ¶¶ 25–70.

The parties agree upon the material facts in this case and each argues that they are entitled to judgment as a matter of law. Dkt. 23 at 3–6; Dkt. 30 at 3–7.

### A.    Count I: First Amendment

Plaintiffs first allege that "Clark County discriminated against Belkot and retaliated against her because of her viewpoint and exercise of First Amendment rights." Dkt. 23 at 7. "When an elected official brings an action for First Amendment retaliation," she "bears the burden of proving" that (1) she "engaged in constitutionally protected activity"; (2) as a result, she "was subjected to adverse action by the defendant"; and (3) "there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Linthicum v. Wagner*, 94 F.4th 887, 892 (9th Cir. 2024). Belkot's First Amendment claim fails for two reasons: first, her intended vote on the C-TRAN motion was not constitutionally protected

activity; and second, the Council's decision to remove her as one of its representatives to C-TRAN was not a materially adverse action in the realm of electoral politics.

        1.      *Belkot's planned vote on the C-TRAN motion was not protected speech.*

The parties agree that the Council's decision "to remove Belkot and replace her with Wil Fuentes was based solely on her representation of how she would vote on an upcoming matter before the C-TRAN Board." Dkt. 23 at 5. This is fatal to her First Amendment claim, because Belkot's vote is not protected speech.

The Supreme Court has held that "restrictions upon legislators' voting are not restrictions upon legislators' protected speech." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125 (2011). "[A] legislator's vote is the commitment" of her "apportioned share of the legislature's power to the passage or defeat of a particular proposal." *Id.* at 126. "The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Id.* Even if a legislator's vote "is the product of deeply held personal belief," or the legislator "would like it to *convey*" her deeply held belief, that belief "does not transform action into First Amendment speech," because "a legislator has no right to use official powers for expressive purposes." *Id.* at 127.

In *Linthicum v. Wagner*, the Ninth Circuit rejected arguments that *Carrigan* applied only to "procedures for voting in legislative assemblies" and instead held it extended to "any official action in the legislature that tends to 'the passage or defeat of a particular proposal.'" 94 F.4th at 889 (quoting *Carrigan*, 564 U.S. at 125–26). *Linthicum* concerned an amendment to the Oregon constitution that made legislators ineligible to run for reelection if they had ten or more unexcused absences from legislative floor sessions. *Id.* at 889. The plaintiff senators argued that their legislative walkouts—which put them over that limit—were protected speech under the

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 12

First Amendment. *Id*. The *Linthicum* court disagreed, grounding its holding in a distinction between legislative actions and speech:

> Voting may be the quintessential exercise of the legislator's "apportioned share of the legislature's power," but it is not the only one. Under *Carrigan*, any official action in the legislature that tends to "the passage or defeat of a particular proposal," is properly understood as a prerogative of membership in that body. No private citizen enjoys the privilege to advance or frustrate legislative action directly in the legislature. The ability to stymie legislation by absenting oneself from a meeting of the Oregon Senate belongs to Senators alone. The use of that power therefore implicates the "governmental mechanics" of the legislative process, and *Carrigan* makes clear that a legislator "has no right" under the First Amendment to use that official power "for expressive purposes." The Senators attempt to claim a personal First Amendment right to walk out, but *Carrigan* is clear that "[t]he legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." We accordingly reject the Senators' claim that their walkout is anything other than an exercise of legislative power.

*Id*. at 893 (quoting *Carrigan*, 564 U.S. at 125–27).

*Linthicum* distinguished itself from *Boquist v. Courtney*, where an Oregon senate committee adopted a policy requiring a senator to provide 12 hours' notice before entering the capitol after other senators claimed his statements were threatening. 32 F.4th 764 (9th Cir. 2022). Unlike the legislative walkout designed "to deny quorum to conduct business in the legislature" in *Linthicum*, Boquist was penalized for statements on the senate floor and to a reporter which the court found were plausibly protected by the First Amendment. *Linthicum*, 94 F.4th at 894–95 (first citing *Boquist*, 32 F.4th at 773; then citing *Carrigan*, 564 U.S. at 128). Boquist's speech was not a "governmental act" and did not use the "governmental mechanics" of the legislative process. *Id*. at 894 (quoting *Carrigan*, 564 U.S. at 127). "As *Carrigan* noted, '[a] legislator voting on a bill is not fairly analogized to one simply discussing that bill or expressing an opinion for or against it. The former is performing a governmental act as a representative of his constituents; only the latter is exercising personal First Amendment rights.'" *Id*. (quoting *Carrigan*, 564 U.S. at 128 n.5).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 13

This case presents a slight twist in that the Council removed Belkot from her role after she *announced* her planned vote, but before the vote took place. But the undisputed facts fall within the precedent of *Linthicum* and *Carrigan* rather than *Boquist*. The parties agree—and the record unambiguously demonstrates—that Belkot's colleagues removed her from the C-TRAN Board because of how she planned to vote on the board's reconsideration of its November 2024 decision regarding light rail funding. Dkt. 23 at 2, 5; Dkt. 33 at 1, 3; *see* Dkt. 26 at 21–22 ("I move to remove Councilor Belkot from the C-TRAN Board as a result of not adhering to the [Council's] direction on the vote of four-to-one to keep the existing MLPA language related to the ONM in light rail.").

Plaintiffs suggest that Belkot was also removed "based on her viewpoint and protected speech," but the record shows that her personal opinions about light rail were irrelevant to the Council's decision. *Id*. at 19 ("To me, it's not about light rail or not light rail . . . if we have a councilor that is not willing to reflect the will of the Council as a whole, they need to be relieved of that position and somebody else placed in it that will represent the Council as a whole. Because this will go a lot further than just light rail in the future."). Belkot was not removed from the C-TRAN Board after she voted as the sole dissenter on the issue at the Council level. Dkt. 24 ¶¶ 11–14; Dkt. 31 ¶¶ 11–13. It was not until after the C-TRAN Board meeting on March 11, 2025, when Belkot "was asked how [she] would vote on this issue" and replied that she "planned on voting against it," that the Council removed her. Dkt. 24 ¶¶ 13–15. "No reason was asserted for [her] removal other than [her] expression that [she] intended to vote as a C-TRAN Board member in a way that the remainder of the [Council] opposed." *Id*. ¶ 15.

There is no evidence in the record that Belkot's reasons for her vote or her statements about the underlying policy issues were the basis for her removal. The undisputed facts show Belkot was removed solely because of her public commitment as to how she would exercise her

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 14

official legislative power. But Belkot's vote on an issue before the C-TRAN Board is not protected speech. Her disclosure of how she would vote "tends to 'the passage or defeat of a particular proposal'" before that body, a privilege that "[n]o private citizen enjoys." *Linthicum*, 94 F.4th at 893 (quoting *Carrigan*, 564 U.S. at 125–26). The use of that vote is a "prerogative of membership" belonging only to those elected Council members who are picked by the Council to serve on the C-TRAN Board. *Id.* Belkot's First Amendment claim fails for this reason alone.

       2.     *The Council's removal of Belkot from C-TRAN was part of the regular political process and not a materially adverse action.*

Even if Belkot's statement about her vote were considered protected speech, her retaliation claim would also fail the second element of her prima facie case. This prong "is satisfied if the elected official was subjected to a 'materially adverse action.'" *Boquist*, 32 F.4th at 776 (quoting *Houston Comm. College Sys. v. Wilson*, 595 U.S. 468, 479 (2022)). "[I]t is more difficult for elected officials to establish that they were subjected to an adverse action that offends the First Amendment because more is fair in electoral politics than in other contexts, and the First Amendment therefore doesn't shield public figures from the give-and-take of the political process." *Id.* (citation modified). An adverse action against an elected official is thus material only when it "prevents the elected official from doing" her job, deprives her of authority she "enjoyed by virtue of [her] popular election," or otherwise prevents her from enjoying "the full range of rights and prerogatives that came with having been publicly elected." *Id.* at 777 (citation modified).

In *Blair v. Bethel School Dist.*, the Ninth Circuit addressed First Amendment claims by an elected school board member picked by the board to serve as its vice president, then subsequently removed from that position after criticizing the district's superintendent. 608 F.3d 540, 542 (9th Cir. 2010). Even assuming his colleagues intended to "play political hardball" and

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 15

"punish him for his advocacy," the Ninth Circuit held his removal did not violate the First Amendment because "his authority as a member of the [school board] was unaffected . . . he retained the full range of rights and prerogatives that came with having been publicly elected." *Id*. at 544. "It is common for political bodies to have internal leadership structures and for members of those bodies to be openly partisan in voting for and against one another for leadership positions. In fact, we *expect* political officials to cast votes in internal elections in a manner that is, technically speaking, retaliatory, *i.e.*, to vote against candidates whose views differ from their own. Indeed, an internal political leadership election is often a referendum on the majority point of view." *Id*.

*Blair* is indistinguishable from the facts here. Plaintiffs argue that the title of "vice president" in *Blair* "was merely a title," whereas Belkot "lost her entire range of rights and prerogatives of being on the C-TRAN Board." Dkt. 33 at 10–11 (citing *Blair*, 608 F.3d at 544). But Belkot was not elected to the C-TRAN Board by her constituents or any members of the public. Whatever rights she enjoyed in that position were the result of her internal election by her colleagues to represent the Council at the Board—not authority she enjoyed by virtue of her public election as a Council member. So long as an elected official is not prevented from "doing his job" or deprived of the "authority he enjoy[s] by virtue of his popular election," politicians are free to play hardball. *See Boquist*, 32 F.4th at 776 (first quoting *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022); then quoting *Blair*, 608 F.3d at 544 n.4). To hold otherwise "is to hold that the First Amendment prohibits elected officials from voting against candidates whose speech or views they don't embrace." *Blair*, 608 F.3d at 544–45.

Because Belkot's vote on the C-TRAN Board is not protected by the First Amendment and she was not entitled to a seat on that board as part of her elected office, the Court DENIES Plaintiffs' motion and GRANTS Defendants' motion for summary judgment on this claim.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 16

**B.    Count II: Equal Protection Clause**

Next, Belkot and Bauer claim that the County violated the one person, one vote principle under the Fourteenth Amendment's Equal Protection Clause. Dkt. 23 at 16–21. They argue that, because the population in unincorporated Clark County is roughly 45 percent of its total population, the nine-member C-TRAN Board should be composed of four delegates from those unincorporated areas. *Id*. at 16–17. According to Belkot, her removal and replacement with Fuentes (who largely represents areas in the City of Vancouver, rather than unincorporated Clark County) "has only made the underrepresentation of rural voters worse." *Id*. at 18. This claim fails for two reasons.

First, it is unclear how *Clark County* could be the cause of any one person, one vote violation. Clark County does not determine the structure or bylaws of the C-TRAN Board. It selects only two of the nine members of the C-TRAN Board—the rest are picked by various cities inside the county. Dkt. 32 at 4–5. The Court agrees with Defendants that Clark County is not the "moving force" behind any violation here, as required for liability under 42 U.S.C. § 1983. Dkt. 34 at 5 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997)).

Second, equal protection requires the one person, one vote principle "be honored if a governmental body is elected, not if it is appointed." *Cunningham v. Municipality of Metro. Seattle*, 751 F. Supp. 885, 891 (W.D. Wash. 1990) (citing *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 54, 56, 58 (1970)). The members of the C-TRAN Board do not "become members as a matter of law upon their various elections" to the Council. *Bd. of Estimate of City of New York v. Morris*, 489 U.S. 688, 692 (1989). Rather, "[t]here is an appointive step: the selection of these persons, and the non-selection of others, must be decided upon not by the voters but by others charged by law with the duty of choosing"—in other words,

the members of the Council. *Cunningham*, 751 F. Supp. at 893. "That the appointment is made from a prescribed group of public officials does not make the office elective rather than appointive." *Id*.

Plaintiff argues that this case differs because the C-TRAN Board is a legislative body, rather than an administrative one. Dkt. 33 at 13–14 (citing *Sailors v. Bd. of Ed. of Kent Cnty.*, 387 U.S. 105, 109–10 (1967) ("We need not decide at the present time whether a State may constitute a local legislative body through the appointive rather than the elective process. We reserve that question for other cases.")). But the one person, one vote principle applies to both administrative and legislative elected offices, in part because distinguishing them "would leave courts with an equally unmanageable principle since governmental activities 'cannot easily be classified in the neat categories favored by civics texts.'" *Hadley*, 397 U.S. at 55–56 (quoting *Avery v. Midland County*, 390 U.S. 474, 482 (1968)); *see also Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 743 n.10 (4th Cir. 2024) ("the Supreme Court seems to have withdrawn from distinguishing between legislative and administrative officials" (quoting *Hadley*, 397 U.S. at 55–56)).

Plaintiffs' distinction implies that elected administrative functions are somehow less entitled to equal representation than legislative ones, and they have provided no support for that. *See Cohanim v. New York City Bd. of Educ.*, 204 F. Supp. 2d 452, 454 (E.D.N.Y. 2002) ("An accurate reading of [*Sailors*] reveals that it held that 'one person, one vote' was inapplicable not because the board was *administrative*, but because the board was *appointed*. . . . It is only by changing the language of the opinion that Ms. Cohanim can suggest that *Sailors* left open the possibility that appointed boards might be held to the 'one person, one vote' standard") (citing *Sailors*, 387 U.S. at 109–10).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 18

Because (1) Clark County is not responsible for any constitutional violation caused by C-TRAN's structure and (2) Belkot's C-TRAN Board position was appointed, not elected, the Court DENIES Plaintiffs' motion and GRANTS Defendants' motion for summary judgment on this claim.

## C.      Count III: Clark County Charter

Plaintiff Belkot claims that the Council did not have the power under the Clark County Charter to remove her before the end of her 1-year term on the C-TRAN Board. Dkt. 23 at 21–22.[4] This analysis begins and ends with the text of RCW 36.57A.050, which establishes the makeup of Public Transportation Benefit Area governing bodies such as the C-TRAN Board.

The statute requires that the C-TRAN Board "shall consist of elected officials selected by *and serving at the pleasure of* the governing bodies of component cities within the area and the county legislative authority of each county within the area." RCW 36.57A.050(1)(a) (emphasis added). The Clark County Charter establishes the Council as the "county legislative authority" which selects those officials. *See* Dkt. 32 at 14 ("The legislative power of the county not reserved to the people or executive branch shall be vested in a county council."); *id.* at 15 ("The enumeration of particular legislative powers shall not be construed as limiting the legislative powers of the council. The council shall be the policy-determining body of the county."). Because the Council has the authority to appoint two C-TRAN board members who serve at the

---

[4] It is not clear that any private right of action exists for the violation of a county charter under Washington law. Plaintiff argues that RCW 7.24 (Washington's Uniform Declaratory Judgment Act) creates such an action because "[a]n actual dispute exists between Plaintiff Belkot and Defendant Clark County whose interests are genuinely opposing in nature." Dkt. 21 ¶ 41. The Court proceeds under the assumption that this claim falls within RCW 7.24.020, which allows the Court to construe a "statute, municipal ordinance, contract or franchise" that affects the "rights, status, or other legal relations" of an interested person. *See Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 186, 157 P.3d 847 (2007).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 19

Council's pleasure, the Council may also remove those board members at any time without violating the Clark County Charter.[5]

The parties dispute the applicability of *Opportunity Township v. Doepke* to this case. 58 Wn.2d 237, 361 P.2d 754 (1961). *Opportunity Township* concerned the power of a mayor to remove a poundmaster. *See id.* The Washington Supreme Court held that "[s]ince the legislature did not, in plain terms, provide that the poundmaster should hold office during good behavior, nor otherwise fix the term, the general rule must apply, that the appointing power may remove the officer at pleasure." *Id.* at 243 (citing *Irving v. Ferguson*, 118 Wash. 37, 202 P. 269 (1921)). Belkot urges the Court to interpret this case as prohibiting removal when appointments have a fixed term. Dkt. 33 at 17. Belkot argues that—although C-TRAN Board spots are not fixed by constitution or statute—she was "chosen . . . for a one-year term." Dkt. 24 ¶ 6. She claims that RCW 36.57A.050's language that board members serve "at the pleasure of" the Council should therefore be cabined by this restriction. Dkt. 33 at 16–17.

This argument fails because *Opportunity Township* is concerned with terms of office fixed *by statute*. The statute at issue in *Opportunity Township* empowered the mayor to remove all appointive officers "for any cause by him deemed sufficient" with the concurrence of six city council members. 58 Wn.2d at 241. The court allowed the mayor's removal of the poundmaster, reasoning "that the legislature intended the poundmaster to be removable at the will of the appointing power, since no term of office was expressly fixed." *Id*. at 242. The same is true here.

---

[5] The Clark County Charter does not conflict with RCW 36.57A.050. Although Plaintiffs argue that the Council may only "confirm or reject appointments to boards and commissions" forwarded by the County Manager, the Charter makes clear its enumeration of that power "shall not be construed as limiting the legislative powers of the Council." Dkt. 23 at 22, Dkt. 32 at 15–16. If the two conflicted, Washington's constitution "expressly relegates home rule charters to an inferior position vis-à-vis" state law. *Washam v. Sonntag*, 74 Wn. App. 504, 508, 874 P.2d 188 (1994).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 20

Although Plaintiffs posit that Belkot was appointed for one year, nothing in the relevant statute specifies the length of her term. *See* RCW 36.57A.050. Based on the statute's clear language that C-TRAN Board members serve "at the pleasure of" the Council and the omission of any term length, *Opportunity Township* supports construing the statute and the charter to allow the Council to remove Belkot before her intended term expired.

Finally, Plaintiffs point to employment law for the proposition that that "[a]ll employment in this state is terminable at will unless there is a fixed duration of time" and that "[n]othing requires that the duration be in the constitution or a statute." Dkt. 33 at 17 (citing *Duncan v. Alaska USA Federal Credit Union, Inc.*, 148 Wn. App. 52, 199 P.3d 991 (2008)). But Plaintiffs' half-argument does not explain why Belkot's appointment should be treated like an employment contract under Washington law.

Because members of the C-TRAN Board "serv[e] at the pleasure of" their appointing body, RCW 36.57A.050(1)(a), the Court DENIES Plaintiffs' motion and GRANTS Defendants' motion for summary judgment on this claim.

## D.    Count IV: Open Public Meetings Act

Plaintiffs claim that Defendants subverted the "agenda" and "notice" requirements of Washington's Open Public Meetings Act (OPMA) at Council Time meetings on February 26, 2025 and March 12, 2025, in order to avoid public comment on light rail funding and Belkot's removal from the C-TRAN Board. Dkt. 23 at 22–25; Dkt. 33 at 18–20. This claim fails because the undisputed record shows that Defendants satisfied their obligations under the OPMA.

First, the OPMA's agenda requirement provides, in relevant part:

> Public agencies with governing bodies must make the agenda of each regular meeting of the governing body available online no later than 24 hours in advance of the published start time of the meeting. . . . Nothing in this section prohibits subsequent modifications to agendas nor invalidates any otherwise legal action taken at a meeting where the agenda was not posted in accordance with this section.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 21

> Nothing in this section modifies notice requirements or shall be construed as establishing that a public body or agency's online posting of an agenda as required by this section is sufficient notice to satisfy public notice requirements established under other laws. Failure to post an agenda in accordance with this section shall not provide a basis for awarding attorney fees under RCW 42.30.120 or commencing an action for mandamus or injunction under RCW 42.30.130.

RCW 42.30.077(1). At Council Time on February 26, 2025, the Council discussed potential reconsideration of the C-TRAN Board's November 2024 decision on light rail funding under a section of the agenda labeled "Policy Updates." Dkt. 26 at 4; Dkt. 31 ¶ 9. While introducing the topic, Marshall stated that "maybe [she] should have mentioned it as an agenda item." *Id*. Plaintiffs argue that the vague agenda description "hid[] a vote potentially obligating taxpayers to fund the significant expenses of light rail operations." Dkt. 23 at 23.

Similarly, during the "Councilor Reports" agenda item at Council Time on March 12, 2025, Marshall raised Belkot's intention to vote against light rail funding before the C-TRAN Board. Dkt. 31 ¶ 16; Dkt. 26 at 6, 10 ("I actually have a report I wanted to report back on the C-TRAN meeting. . . . The motion whether or not to have permissive language for C-TRAN related to ONM for light rail, which was adopted by the C-TRAN Board in November and came back to the C-TRAN Board [last] night for reconsideration. . . . I don't feel like the direction that was given by the Council was actually followed by both of us."). The Councilors discussed the issue, removed Belkot from the C-TRAN Board, and replaced her with Fuentes. *Id*. at 10–25. Plaintiffs argue that conducting this discussion under the "Councilor Reports" section of the agenda "did not disclose that the Board would be considering an action to strip Belkot of her position on the C-TRAN Board." Dkt. 33 at 5.

Although the agenda items from February 26 and March 12, 2025 do not specify all issues discussed on those dates, they satisfy the OPMA's agenda requirement. The OPMA only requires the Council to make available the agenda of each regular meeting no later than 24 hours

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 22

in advance of the meeting's published start time. RCW 42.30.077. The statute does not prescribe which items or sub-topics must be included on an agenda. As Defendants note, this section differs from the one concerning "special" meetings, which requires such notices to "specify . . . the business to be transacted." Dkt. 34 at 10 (quoting RCW 42.30.080(3)). The agenda requirement also exists alongside other provisions of the OPMA that ensure certain actions are taken only in meetings open to the public that occur on a regular schedule, such as Council Time. *See, e.g.*, RCW 42.30.060; 42.030.075.

While one might imagine an online posting so deficient as to not even meet a definition of "agenda"[6], that is not the case here. Both agendas list nine main topics, some of those topics broken down into more specific subtopics. Dkt. 26 at 4, 6. The "Policy Updates" and "Council Reports" section headings encompass what the Council discussed—an update on C-TRAN's consideration of light rail funding and Marshall's report on Belkot's position at the C-TRAN Board meeting, respectively. *Id*.; Dkt. 31 ¶¶ 9–12, 16–18. Plaintiffs cite no authority to support the conclusion that the failure to delineate every topic under those categories violates the OPMA.[7]

Second, the OPMA's notice requirement provides:

No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter. Any action taken

---

[6] *See Agenda*, *Black's Law Dictionary* (12th ed. 2024) ("A list of things to be done, as items to be considered at a meeting, usu. arranged in order of consideration.").

[7] Additionally, because a violation of the agenda requirement is not a basis to nullify action taken at a meeting, bring an action for mandamus or injunction, or recover attorney's fees, the most Plaintiffs could recover for this alleged violation is a civil penalty of either $500 or $1000 against individual members of the Council. RCW 42.30.120(1), (2). But Plaintiffs appear not to have plead their OPMA claim against Councilmember Fuentes, the only individual named as a defendant in this lawsuit. *See* Dkt. 21 ¶ 63 ("Plaintiffs seek all relief available for Clark County's violation of the OPMA.")

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 23

at meetings failing to comply with the provisions of this subsection shall be null and void.

RCW 42.30.060(1). The parties agree that the Council allowed public comment during both the February 26 and March 12, 2025 Council Time meetings, which occurred at regularly scheduled times and were open to the public. Dkt. 23 at 23. But Plaintiffs maintain that, "[w]hile the meeting was technically open to the public, the matters to be addressed were not provided in the agenda as required by the Rules of Procedure to give members of the public the opportunity to decide to come to the meeting to express their views or submit comments on this subject." *Id.* Plaintiffs further note that "members of the public were prohibited from commenting on any issue not on the agenda." *Id.*; Dkt. 26 at 4, 6 (agendas noting that public comment was "on agenda items only").

Again, Plaintiffs fail to explain how the Council violated the OPMA. The notice requirement does not mandate that public comment happen before or after certain agenda items, nor does it require pausing for additional public comment before making certain decisions (such as the removal of a Council member from a board). RCW 42.30.060(1). When interpreting whether the Council's agendas adequately informed the public under OPMA, the Court may simply return to the OPMA's agenda requirement—which, as discussed above, the Council did not violate.[8] While Plaintiffs may be frustrated that the Council did not fully preview important

---

[8] The Court has reviewed the report of Deputy Lyle, which asserts that the Council violated the OPMA by removing Belkot from her position and recommends that she be reinstated. Dkt. 35-2. Even if the Court concluded that some information in the report could "be presented in a form that would be admissible in evidence" by calling Lyle to testify at trial, *see* Fed. R. Civ. P. 56(c)(2), the factual assertions in the report are consistent with the rest of the record and do not create a material dispute of fact. As to Lyle's opinions and legal conclusions, those are not admissible in any form and cannot either support Plaintiff's motion or defeat Defendants' motion for summary judgment.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 24

decisions to which Plaintiffs were opposed, they point to no evidence or authority from which the Court could conclude that the Council violated the OPMA.

Because the Council adhered to the OPMA's agenda and notice requirements, the Court DENIES Plaintiffs' motion and GRANTS Defendants' motion for summary judgment on this claim.

**E.    Count V: Quo Warranto**

Finally, Plaintiffs claim all Defendants should be liable under Washington's Quo Warranto statute, which allows an action by someone who "claims an interest" in a public office against someone who "usurp[s], intrude[s] upon, or unlawfully hold[s] or exercise[s]" that office. Dkt. 23 at 25–27; RCW 7.56.010, 7.56.020.

As discussed above, Belkot's position on the C-TRAN Board was not unlawfully usurped or intruded upon by the Council or Wil Fuentes. The Council had the authority to remove Belkot, and Plaintiffs have not shown that the Council violated any law in doing so.

Because no underlying usurpation of Belkot's seat occurred to support a Quo Warranto action, the Court DENIES Plaintiffs' motion and GRANTS Defendants' motion for summary judgment on this claim.

**V.    CONCLUSION**

The Court DENIES Plaintiffs' motion for summary judgment. Dkt. 23. The Court GRANTS Defendants' motion for summary judgment. Dkt. 30. Plaintiffs' claims are DISMISSED with PREJUDICE.

Dated this 18th day of March, 2026.

Tiffany M. Cartwright
United States District Judge

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 25